IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs March 9, 2005

## STATE OF TENNESSEE v. LESHAUN NORWOOD

**Direct Appeal from the Circuit Court for Maury County**
**No. 12233     Stella Hargrove, Judge**

---

### No. M2003-00541-CCA-R3-CD - Filed June 16, 2005

---

A Maury County Circuit Court jury found the appellant, LeShaun Norwood, guilty of second degree murder, and the trial court sentenced him to twenty-five years in the Department of Correction (DOC).  In this appeal, the appellant claims (1) that the evidence is insufficient to support the conviction, (2) that the trial court erred by refusing to suppress his confession to police, and (3) that the trial court erred by admitting prejudicial photographs into evidence.  Upon review of the record and the parties' briefs, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court is Affirmed.**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which JOSEPH M. TIPTON and JOHN EVERETT WILLIAMS, JJ., joined.

James M. Marshall, Columbia, Tennessee, for the appellant, LeShaun Norwood.

Paul G. Summers, Attorney General and Reporter; Seth P. Kestner, Assistant Attorney General; T. Michael Bottoms, District Attorney General; and Robert C. Sanders and J. Daniel Runde, Assistant District Attorneys General, for the appellee, State of Tennessee.

### OPINION

### I.  Factual Background

At trial, Deputy Nathan Pagel of the Maury County Sheriff's Department testified that he lived on the Ridley-Jewel farm.  About 6:00 a.m. on January 24, 2001, Deputy Pagel received a telephone call from Eva James Crichton, who owned the farm with her husband.  Mrs. Crichton told Deputy Pagel that a farm-hand had found a body near a barn.  Deputy Pagel went to the barn and saw the victim lying face-down next to a water trough.  Deputy Pagel saw a wound behind the victim's right ear, telephoned the sheriff's department, secured the crime scene, and waited for the police to arrive.  He testified that he heard no gunshots on the night of January 23.

Agent T. J. Jordan of the Tennessee Bureau of Investigation (TBI) testified that he investigated the victim's death at the Ridley-Jewel farm and arrived at the crime scene about 9:35 a.m. on January 24. Agent Jordan saw that the victim was wearing tennis shoes, blue jeans, a t-shirt, and a long-sleeved jersey and that the victim had two gunshot wounds, one to the back and one to the back of the head. The victim was holding a cigarette lighter in his right hand and had a checkbook, seventeen dollars, an ATM debit card, and a pack of cigarettes on his person. Agent Jordan learned that the victim was Phillip Wilson and went to the victim's home to speak with the victim's relatives. During his investigation, Agent Jordan learned that Ryan Pace and Patty Holcomb may have been involved in the victim's death. He testified that on the night of January 24, Agent Jason Fogel and Lieutenant Jim Brady went to Holcomb's house. Holcomb was not home, but arrived with the appellant in her blue van as the officers were leaving. The officers asked Holcomb to come to the sheriff's department, and she agreed. Although the officers had not asked the appellant to come to the department, he arrived with Holcomb.

At the sheriff's department, Agent Jordan interviewed Holcomb and then interviewed the appellant. In the appellant's first statement to Agent Jordan, he placed himself at the crime scene. However, the appellant stated that he did not know anything about the victim's death. After taking the appellant's statement, Agent Jordan left the sheriff's department and went to pick up Ryan Pace. Agent Jordan brought Pace to the sheriff's department and allowed Pace to speak with the appellant. The appellant then changed his story, saying that he and Pace took the victim to the farm because the victim owed the appellant $1,100 and the appellant was going to try to get his money from the victim. He also told Agent Jordan that he shot the victim because the victim was "digging in his hooded jacket" and he thought the victim was reaching for a gun. On cross-examination, Agent Jordan testified that the appellant and Holcomb told him that the victim had stolen money from them. He also said the appellant and Pace told him that an argument had occurred at the farm and that the victim had appeared to be reaching for a gun.

Cheryl Wilson, the victim's mother, testified that about 6:00 p.m. on January 23, she and her husband went to Hardee's to get the victim two chicken sandwiches. They got the sandwiches and brought them home for the victim. Later that evening, the victim told his mother that he needed $500 in order to buy a car from Ryan Pace. However, Mrs. Wilson told the victim that she did not have the money. The victim told Mrs. Wilson that he was going to a nearby McDonald's to wait for Pace to get off work and that he and Pace were going into the country to look at Pace's car. The victim left home about 7:30 p.m. On cross-examination, Mrs. Wilson testified that the victim had been diagnosed with schizophrenia, that he had "thug life" and "AK" tattooed on his chest, and that he was not a member of a gang.

Agent Vance Jack of the TBI testified that he assisted in the investigation of the victim's death. On January 25, he interviewed Patty Holcomb, who told him where to find the murder weapon. Based on her information, Agent Jack found a Smith and Wesson .38 revolver and twenty-two bullets. On cross-examination, Agent Jack testified that Holcomb said the gun was hers.

Lieutenant Jim Brady of the Maury County Sheriff's Department testified that on the morning of January 24, 2001, he was dispatched to the Ridley-Jewel farm. When he arrived, he saw the victim lying next to a water trough. The police secured the crime scene and waited for agents from the TBI Crime Laboratory to arrive. Lieutenant Brady investigated the victim's death and learned that Ryan Pace and Patty Holcomb might be involved. Lieutenant Brady and Agent Fogel went to Holcomb's house, but she was not there. As the officers were leaving, Holcomb arrived in her blue minivan with the appellant sitting in the passenger seat. The officers asked Holcomb to come to the sheriff's department, and she agreed. When Holcomb arrived at the sheriff's department, the appellant was with her. While Agent Jordan and Detective Robert Denton questioned Holcomb, Lieutenant Brady and Agent Fogel took the appellant into Brady's office. The appellant said he was eighteen years old, and the officers read him his rights. At some point, Agent Jordan came into the office and began questioning the appellant. Agent Jordan and Lieutenant Brady then left the sheriff's department, picked up Ryan Pace, and brought him to the sheriff's department for questioning.

TBI Agent Steve Scott testified as a ballistics expert for the state. On January 25, 2001, he received two bullets recovered from the victim. On January 26, he received a .38 revolver. Agent Scott test-fired bullets from the gun and compared them to the bullets recovered from the victim. Agent Scott concluded that the bullets recovered from the victim were fired from the revolver. Agent Scott related that he found no gunpowder residue on the victim's sweatshirt, indicating that the victim was not shot at close range. On cross-examination, Agent Scott acknowledged that the lack of gunpowder residue on the victim indicated that the gun was fired at least two feet away from the victim.

Deputy Robert Denton testified that on January 24, 2001, he was a detective with the Maury County Sheriff's Department and was dispatched to the Ridley-Jewel farm. Agent Jordan found an ATM receipt on the victim. Through their investigation, officers learned the victim's identity and that Patty Holcomb and Ryan Pace might be involved in the victim's death. Deputy Denton talked with Holcomb at the sheriff's department and then went to Pace's house and talked with him. Pace came to the sheriff's department and gave a statement, implicating himself in the victim's death.

Gennie Vestal testified that her son, Freddie Moss, worked for Mr. and Mrs. Crichton on the Ridley-Jewel farm and that the appellant was her great nephew. About 9:30 p.m. on January 23, Ms. Vestal drove her son to the farm. As Ms. Vestal was leaving, she passed a white Lincoln Continental entering the farm. She said that she did not hear any gunshots.

Dr. Charles Harlan testified that he performed the victim's autopsy. The victim received two gunshots, one to the back of the head and one to the back. The victim also had a head laceration consistent with his having fallen and struck his head on the water trough. Dr. Harlan stated that the gunshot wound to the victim's back was not fatal but that the gunshot to the head caused instantaneous death. He said he could not determine which gunshot wound the victim received first.

Ryan Pace testified for the defense that he was seventeen years old at the time of the victim's death. On January 22, 2001, he went to school and then went to his job at McDonald's. About 8:00

p.m., Patty Holcomb telephoned Pace at work and told him that she could get a good deal on some marijuana. Pace got off work about 9:00 p.m. and met Holcomb outside the restaurant. The two of them left the McDonald's in Holcomb's blue minivan and parked at a grocery store. While they were parked, the victim and a man named Bubba Tinsley walked up to the van and offered to sell them marijuana. Pace got out of the van and began walking with the victim and Tinsley. As they were walking, the victim pulled out a gun, shot into the ground, and then gave the gun to Tinsley. The three men stopped at a house, and Pace gave the victim his .22 pistol and $300 to buy marijuana. While Pace and Tinsley waited near some trees, the victim went inside the house. The victim came outside and told Pace that the people inside the house wanted more money. Pace gave the victim another $60. The victim went back into the house, and Pace heard a commotion. The victim came out of the house and told Pace that the people inside had taken Pace's money and gun. Pace and the victim walked back to Holcomb's van and got in. The three went to get gasoline for the van and at some point, the victim got out of the van. About 11:00 p.m., Holcomb and Pace went back to the house where the victim allegedly had been robbed. The appellant was there and told Holcomb and Pace that the victim had been in the house earlier that evening. According to the appellant, no one had robbed the victim. Holcomb and Pace then went to the victim's house to confront the victim. However, a woman came to the door and told them that they could not talk to the victim.

Ryan Pace testified that the next day, January 23, he went to school and then went to work at McDonald's. The victim came to McDonald's and told Pace that he could help Pace get his money back. The victim waited all afternoon and evening at McDonald's for Pace to get off work. When Pace got off work about 9:00 p.m., the appellant and Patty Holcomb were sitting outside the restaurant in Holcomb's van. The appellant got out of the van, and Holcomb drove away. Pace, the appellant, and the victim got into Pace's white Lincoln Continental and left McDonald's. They stopped and got gas and then drove to the Ridley-Jewel farm. According to Pace, they went to the farm in order to get some tools out of a barn and use the tools to fix a problem with Pace's car.

Pace pulled up to the barn, and everyone got out of the car. Pace testified that it was very dark but that he could see silhouettes. He stated that while the appellant was looking for a light switch in the barn, the victim reached into the victim's pocket. The appellant pulled out a gun and shot the victim. Pace testified that he ran, heard another gunshot, and got into the car. He related that the appellant also got into the car and told Pace that "he could smoke [Pace] as easy as he smoked [the victim]." They left the farm and drove to Patty Holcomb's house.

On cross-examination, Pace testified that the juvenile court adjudicated him delinquent of felony murder and kidnapping. He said that the victim waited for him at McDonald's all afternoon and that the victim's mother was mistaken when she testified that the victim was at home. He said that he was scared of the victim and never discussed selling his car with the victim. Pace acknowledged that although he was afraid of the victim, he allowed the victim to get into his car on the night of January 23. He said that after the appellant fired the first shot at the victim, he saw the victim running. After the shooting, the appellant wiped down the gun.

The appellant testified that he was nineteen years old at the time of trial but was seventeen at the time of the shooting and was transferred from juvenile court to be tried as an adult. About 8:00 p.m. on January 22, 2001, the appellant was at Brandon Strickland's house. The victim arrived and stayed about ten minutes. Before the victim left, he asked the appellant to go outside and yell. The appellant did as the victim had requested, and the victim ran away. About five or ten minutes later, the victim came back to the house and again asked the appellant to go outside and yell. The appellant again did as the victim had requested, and the victim ran from the house.

The appellant testified that later that night, Patty Holcomb and Ryan Pace came to the house and told him that the victim had accused the appellant of robbing the victim. The appellant told Holcomb and Pace that he did not rob the victim, and the three of them went to the victim's house to confront the victim. Holcomb went to the front door, but a woman answered the door and said that Holcomb could not see the victim. The three of them left the victim's house, and Holcomb took the appellant back to Strickland's house. The next day, the victim and Emily Williams came to Strickland's house. The appellant, the victim, and Williams left Strickland's house, rode around in Williams' car, and smoked marijuana. About 4:00 p.m., they stopped at McDonald's, and the victim went inside for about ten minutes. They left the restaurant, and the victim told them, "I've got to get ready for my plan. I've got to get ready for what I'm going to do." The victim told the appellant that he was going to rob Ryan Pace and take Pace's car. The victim told the appellant that if the appellant would help him, he would give the appellant the car's rims.

The appellant testified that he agreed to help the victim rob Pace and that he told the victim he knew of a farm where they could take Pace. The victim told the appellant to meet him at McDonald's at 9:00 p.m., when Pace got off work. Williams and the appellant then dropped the victim off at his house. About 9:00 p.m., Williams and the appellant went to McDonald's. Holcomb was there, and the appellant got into her van. Holcomb told the appellant that Pace had asked her to come to McDonald's because he was afraid of the victim. Holcomb asked the appellant to go with Pace and the victim and make sure nothing happened to Pace. About 9:15 p.m., Pace and the victim came out of McDonald's. Pace, the appellant, and the victim got into Pace's Lincoln. They stopped at a gas station, and the victim went inside to pay for gas. While the victim was gone, Pace told the appellant he wanted to get his money back from the victim.

The victim returned to the car and the three men drove to the Ridley-Jewel farm. Pace pulled up to the barn, and the victim and the appellant got out of the car. The appellant told the victim to give Pace his money back. According to the appellant, the victim said, "[F]*** that. F*** that. I'm going to do this sh**." Pace got out of the car, and the appellant saw the victim reach into the victim's waistband. The appellant pulled a gun out of his jacket pocket, and "it just went off." He stated that he shot the victim because he thought the victim was going to shoot somebody. The appellant related that he did not know how many times he fired the gun. He said that after he shot the victim, he ran to the car and sat in the passenger seat. Pace also got into the car, and they drove away from the barn. The appellant acknowledged that he wiped down the gun but said that he did not tell Pace he would "smoke" him. The appellant also acknowledged that he lied to the police in

-5-

his first statement. However, he said that he had been under the influence of marijuana and was scared.

On cross-examination, the appellant acknowledged that Holcomb and Pace were mad at the victim and wanted to get their money back from the victim. The appellant said that he was not planning to kill anyone on the night of January 23 and did not remember telling Agent Jordan that the victim owed him $1,100. He said that when he shot the victim, the victim had not threatened him. He acknowledged that he first shot the victim in the back but denied that he meant to kill the victim with the second shot. He acknowledged that after the first shot, the victim was not posing a threat to him. He also acknowledged that he did not check on the victim after the shooting. Although the appellant had been charged with first degree premeditated and felony murder and especially aggravated kidnapping, the jury convicted him of second degree murder.

## II. Analysis

### A. Sufficiency of the Evidence

The appellant contends that the evidence is insufficient to support his conviction. He contends that the evidence shows he acted in self-defense and that the state failed to disprove his claim of self-defense. The State argues that the evidence is sufficient. We agree with the State.

On appeal, a jury conviction removes the presumption of the appellant's innocence and replaces it with one of guilt, so that the appellant carries the burden of demonstrating to this court why the evidence will not support the jury's findings. See State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). The appellant must establish that no "reasonable trier of fact" could have found the essential elements of the offense beyond a reasonable doubt. See Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); Tenn. R.App. P. 13(e).

Accordingly, on appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn therefrom. See State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983). In other words, questions concerning the credibility of witnesses and the weight and value to be given the evidence, as well as all factual issues raised by the evidence, are resolved by the trier of fact, and not the appellate courts. See State v. Pruett, 788 S.W.2d 559, 561 (Tenn. 1990). To sustain the appellant's conviction for second degree murder, the State was required to prove that the appellant knowingly killed the victim. See Tenn. Code Ann. § 39-13-210(a)(1).

In the instant case, the evidence shows that the appellant, Ryan Pace, and the victim drove to the Ridley-Jewel farm. Agent Jordan testified that the appellant told him the victim owed the appellant money and that the appellant was going to try to get his money back. According to Pace, the victim had stolen money from him also. Taken in the light most favorable to the state, the proof at trial demonstrated that the appellant shot the victim, who was unarmed, in the back. The appellant admitted that he then shot the victim, who was not posing a threat to him, in the back of the head.

The appellant's main complaint regarding the sufficiency of the evidence is the jury's rejection of his claim of self-defense. Tennessee Code Annotated section 39-11-611(a) provides:

> A person is justified in threatening or using force against another person when and to the degree the person reasonably believes the force is immediately necessary to protect against the other's use or attempted use of unlawful force. The person must have a reasonable belief that there is an imminent danger of death or serious bodily injury. The danger creating the belief of imminent death or serious bodily injury must be real, or honestly believed to be real at the time, and must be founded upon reasonable grounds.

Self-defense is essentially a question of fact to be determined by the jury. See State v. Clifton, 880 S.W.2d 737, 743 (Tenn. Crim. App. 1994); State v. Ivy, 868 S.W.2d 724, 727 (Tenn. Crim. App. 1993). As such, "in the context of judicial review of the jury verdict, in order to prevail, the [appellant] must show that the evidence relative to justification, such as self-defense, raises, as a matter of law, a reasonable doubt as to his conduct being criminal." Clifton, 880 S.W.2d at 743.

The only proof at trial supporting the appellant's claim of self-defense was his and Pace's testimony that the victim appeared to be reaching for a gun. However, it is within the jury's prerogative to accept or reject a claim of self-defense. See State v. Goode, 956 S.W.2d 521, 527 (Tenn. Crim. App. 1997). Given that the appellant shot the victim in the back and then in the back of the head, we conclude that the jury was well within its purview to reject the appellant's claim of self-defense.

### B. Motion to Suppress

Next, the appellant claims that the trial court erred by denying his motion to suppress his confession to police. He contends that "the facts of the case convincingly suggest that the confession was not voluntarily and freely given." The State claims the trial court properly denied the motion. We agree with the State.

At the suppression hearing, Lieutenant Jim Brady testified that he and Detective Fogel investigated the victim's death and began looking for Patty Holcomb. They located Holcomb and asked if she would come to the sheriff's department for questioning. Holcomb agreed to come to the sheriff's department and brought the appellant with her. The officers had not asked the appellant to come to the department. While Holcomb went into a conference room for questioning, the appellant went into Lieutenant Brady's office. Lieutenant Brady heard the appellant say that he was related to someone who lived on the Ridley-Jewel farm. Lieutenant Brady testified that he wanted to ask the appellant about his connection to the farm. He asked the appellant his age, and the appellant told him he was eighteen years old and gave his birthdate as August 8, 1982. Lieutenant Brady then read the appellant his rights and had the appellant sign a waiver of rights form. He related that the appellant was not under arrest at that time. Agent Jordan came into Lieutenant

Brady's office and began questioning the appellant. The appellant was calm and did not appear to be under the influence of drugs.

On cross-examination, Lieutenant Brady testified that he did not ask to see the appellant's driver's license and did not ask about his education. He stated that the interview was not audio- or videotaped and that Agent Jordan did not reread the appellant his rights when he came into Lieutenant Brady's office. He said that after questioning the appellant, Agent Jordan left the sheriff's department to pick up Ryan Pace and that the appellant was not free to leave at that time. When Agent Jordan returned to the sheriff's department, he interviewed the appellant again. After the second interview, Lieutenant Brady learned the appellant was seventeen years old.

Agent T. J. Jordan testified at the hearing that on the night of January 23, he interviewed Patty Holcomb. He then went into Lieutenant Brady's office to interview the appellant. The appellant did not have slurred speech, "appeared fine," and was not under arrest. The appellant gave his first statement in which he denied shooting the victim. After this first interview, Agent Jordan left the sheriff's department to pick up Ryan Pace. Agent Jordan brought Pace to the department on the morning of January 25 and allowed Pace to talk with the appellant. The appellant then gave his second statement, confessing to shooting the victim. He said that the appellant did not appear to be groggy, that the appellant did not ask to rest, and that he did not threaten the appellant or promise him anything in return for his confession. On cross-examination, Agent Jordan testified that after the appellant's first statement, the appellant was in custody. He also said that he did not read the appellant his rights before the second interview. He said that during each interview, he wrote down the appellant's statement. When the appellant finished giving his statements, Agent Jordan read the statements back to him and had the appellant initial the beginning and end of each paragraph in the statements.

The trial court ruled that the appellant received Miranda warnings and waived his rights. The trial court noted that the appellant appeared to be mature for his age and that he did not appear to be under the influence of drugs or alcohol when he gave his confession. It denied the appellant's motion to suppress his confession.

In reviewing a trial court's determinations regarding a suppression hearing, "[q]uestions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996). Thus, "a trial court's findings of fact in a suppression hearing will be upheld unless the evidence preponderates otherwise." Id. Nevertheless, appellate courts will review the trial court's application of law to the facts purely de novo. See State v. Walton, 41 S.W.3d 75, 81 (Tenn. 2001). Furthermore, the State, as the prevailing party, is "entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from the evidence." Odom, 928 S.W.2d at 23. Moreover, we note that "in evaluating the correctness of a trial court's ruling on a pretrial motion to suppress, appellate courts may consider the proof adduced both at the suppression hearing and at trial." State v. Henning, 975 S.W.2d 290, 299 (Tenn. 1998).

In Miranda v. Arizona, the United States Supreme Court held that pursuant to the Fifth and Fourteenth Amendments' protection against compelled self-incrimination, police officers must advise an appellant of his right to remain silent and the right to counsel before they may initiate custodial interrogation. 384 U.S. 436, 479, 86 S. Ct. 1602, 1630 (1966). If the officers fail to give these warnings, statements made by the appellant may not be admitted for certain purposes in a criminal trial. Stansbury v. California, 511 U.S. 318, 322, 114 S. Ct. 1526, 1528 (1994). The appellant must waive constitutional rights "voluntarily, knowingly and intelligently." Miranda, 384 U.S. at 444, 86 S. Ct. at 1612. The state has the burden of proving the waiver by a preponderance of the evidence. State v. Bush, 942 S.W.2d 489, 500 (Tenn. 1997). In determining whether an appellant has validly waived his rights, courts must look to the totality of the circumstances. State v. Middlebrooks, 840 S.W.2d 317, 326 (Tenn. 1992). We consider the following factors in determining the voluntariness of a confession: the appellant's age; education or intelligence level; previous experience with the police; the repeated and prolonged nature of the interrogation; the length of detention prior to the confession; the lack of any advice as to constitutional rights; the unnecessary delay in bringing the appellant before the magistrate prior to the confession; the appellant's intoxication or ill health at the time the confession was given; deprivation of food, sleep, or medical attention; any physical abuse; and threats of abuse. State v. Huddleston, 924 S.W.2d 666, 671 (Tenn. 1996).

In this case, the appellant voluntarily came to the sheriff's department with Patty Holcomb. The record reflects that he signed a waiver of rights form at 11:29 p.m. on January 24, gave his initial statement at 1:45 a.m. on January 25, and confessed to killing the victim at 5:45 a.m. The appellant does not contest the fact that he was advised of his Miranda rights or that he signed a waiver of rights form. Instead, he contends that his confession was involuntary because he was deprived of rest and was not readvised of his Miranda rights before he gave his confession. The trial court concluded that the appellant was sufficiently apprised of his rights and waived those rights. The written waiver supports the trial court's conclusion. Moreover, Lieutenant Brady and Agent Jordan testified that the appellant was calm and did not appear to be under the influence of drugs when he gave his statements. Agent Jordan also testified that the appellant did not appear to be sleepy. Although the appellant was only seventeen at the time of the crime, he lied to the officers, telling them he was eighteen years old and giving a birthdate that would make him eighteen. The trial court noted that the appellant appeared mature for his age, and the officers did not threaten the appellant or promise him anything in return for his confession. We conclude that the evidence does not preponderate against the trial court's ruling that the appellant knowingly, intelligently, and voluntarily confessed to killing the victim.

### C. Prejudicial Photographs

Finally, the appellant claims the trial court erred by admitting prejudicial photographs into evidence. However, the appellant has waived this issue by failing to include it in his motion for new trial. See Tenn. R.App. P. 3(e).

### III. Conclusion

Based upon the record and the parties' briefs, we affirm the judgment of the trial court.

_____
NORMA McGEE OGLE, JUDGE